No. 2-08-1090     Filed: 8-23-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08--CF--456 |
| RICARDO LISSADE, | ) ) | Honorable Daniel Shanes, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the opinion of the court:

Following a bench trial, defendant, Ricardo Lissade, was found guilty of unlawful restraint (720 ILCS 5/10--3(a) (West 2008)) and domestic battery (720 ILCS 5/12--3.2(a)(1) (West 2008)), and he was sentenced to five years' imprisonment on the unlawful restraint conviction. On appeal, defendant contends that his conviction of unlawful restraint must be vacated and that he should be sentenced on the lesser included offense of domestic battery, because the State failed to prove beyond a reasonable doubt that he knowingly detained the victim. We disagree, and, thus, we affirm.

The evidence presented at trial revealed the following. Defendant and the victim, Jana Sandness, were in a relationship. Two children, Ricky and Jaylen, were born to the couple during that relationship. Toward the end of the couple's relationship, they lived together in a townhouse. When the relationship ended in May 2007, defendant moved out of the townhouse, but Sandness and the children continued to live there. When defendant moved out, Sandness never changed any of the

locks on the doors or the code to get into the garage using the keyless entry pad. To cut down on expenses, Sandness shared the townhouse with a roommate, Marianna Robles, after May 2007.

On the evening of November 2, 2007, defendant was upset because Sandness had begun dating another man, and defendant did not want Sandness's new boyfriend to be around Ricky and Jaylen. Defendant attempted to call Sandness to tell her that he was coming over to the townhouse to take the children away from her, but Sandness would not answer her phone. Because Sandness would not answer, defendant sent a text message to Sandness, threatening to take Ricky and Jaylen. Sandness, who was scared by defendant's threats, attempted to temporarily change the code on the keyless entry pad leading into the garage, but, because she was so scared, she was unable to do it successfully.

Sandness texted Robles, who was waitressing, to tell her that defendant had threatened to come over and take the children. Robles did not respond to the text but, rather, waited to talk with Sandness when Robles got home from work. When Robles came home later that night, Sandness was scared. Robles talked with Sandness until midnight, when Sandness went to sleep in the master bedroom. Ricky, who was five years old, was sleeping in the bed with Sandness. Robles fell asleep on the living room couch at 2 a.m. and was awakened around 4:30 a.m. when she heard defendant enter the house through the garage.

When Robles heard defendant, she went upstairs to wake Sandness. Sandness reached for her cellular phone, which was recharging on the nightstand by the bed. Before she could get her phone, defendant grabbed it from Sandness, breaking the charger in the process. Defendant began swearing at Sandness, calling Sandness a "bitch" and ordering Sandness to get Ricky and Jaylen ready to leave with defendant. Defendant then went into the children's room, where Jaylen, who was

an infant, was crying in his crib.  Defendant picked Jaylen up, but Sandness took Jaylen from defendant, held Jaylen close to her, and went downstairs.  Defendant followed.

Sandness sat on the couch, holding Jaylen, and Robles and Ricky sat next to her.  Robles attempted to call the police on her cellular phone, but, before she was connected to the police department, defendant grabbed the phone from her, breaking it.

Then, using one hand, defendant grabbed Sandness by the throat, pushed her up against the couch very hard, and began choking her.  Sandness, who was still holding Jaylen, became pale and was gasping for air.  While choking Sandness, defendant looked Sandness in the eyes and asked, "Do you think I am afraid to kill you, bitch?"  Sandness, who thought that defendant was going to kill her, let go of Jaylen.  She then kicked at defendant and grabbed at his hand that was around her throat in an attempt to free herself from defendant, but she was unsuccessful.  Sandness stated that she could not move when defendant was choking her, because defendant was "very, very strong that night."  Robles intervened and tried to get defendant off of Sandness.  Robles stated that she was unable to free Sandness from defendant's grasp, as defendant was a "solid rock."  Using his other hand, defendant then grabbed Robles by the back of her neck.  Ricky, who was observing what was happening, said something, and defendant let go of both Sandness and Robles.

Robles retrieved her coat and went to a neighbor's house to call the police.  After the police arrived, photographs were taken of Sandness's injuries, which included bruising and swelling around her neck.  Defendant was arrested and questioned by the police.  When asked what he was thinking about as he was choking Sandness, defendant said that he was thinking about how he wanted his children with him and did not want Sandness to hurt them.  Defendant also indicated that he knew

that if he did not stop choking Sandness, she would die, but he did not know why he stopped choking Sandness.

In finding defendant guilty of unlawful restraint, the trial court made the following statement:

"That brings us to the unlawful restraint. That's a lot more easily resolved, at least for me. As I said, the defendant was holding the victim down on the couch choking her. As the indictment says, the defendant knowingly without legal authority detained Jana Sandness and that he restrained her by grabbing her about the neck, would not allow her to escape from his grasp. That is exactly what he did. He held her against the couch. There was a struggle as I have already found for an appreciable amount of time. She tried to get away. He wouldn't release her, at least until later, and it actually took the intervention of a third party, Miss Robles, in order to get her out of there.

*** [Defendant] unlawfully restrained [Sandness]. I have absolutely no hesitation in finding based upon my review of the evidence that defendant is guilty of that offense."

At issue in this appeal is whether defendant was proved guilty beyond a reasonable doubt of unlawful restraint. When reviewing a challenge to the sufficiency of the evidence, we consider whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. People v. Wheeler, 226 Ill. 2d 92, 114 (2007). The critical inquiry in reviewing the sufficiency of the evidence is whether the record evidence could reasonably support a guilty finding, regardless of whether the evidence is direct or circumstantial and whether the trial was by bench or by jury. Wheeler, 226 Ill. 2d at 114. Because the trier of fact is best positioned to judge the credibility of the witnesses and resolve disputes in the evidence, its decision is entitled to great deference. Wheeler, 226 Ill. 2d at 114-15.

Thus, we do not retry the defendant when evaluating the sufficiency of the evidence and will reverse the defendant's conviction only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. Wheeler, 226 Ill. 2d at 115.

Unlawful restraint requires the State to prove that the defendant knowingly and without legal authority detained another. 720 ILCS 5/10--3(a) (West 2008). Defendant does not dispute that he had no legal authority to hold Sandness by the throat or that he restricted Sandness's movement by doing so. Rather, defendant claims that he was not proved guilty beyond a reasonable doubt of unlawful restraint because he did not act "knowingly."

A person acts knowingly when "he is consciously aware that such result is practically certain to be caused by his conduct." 720 ILCS 5/4--5(b) (West 2008). A mental state is seldom proved by direct evidence and must generally be inferred from the surrounding circumstances. See People v. Moreno, 334 Ill. App. 3d 329, 344 (2002). However, the State must still prove the required mental state beyond a reasonable doubt. See People v. Maggette, 195 Ill. 2d 336, 354 (2001). Thus, " '[t]he State must present sufficient evidence from which an inference of knowledge can be made, and any inference must be based upon established facts and not pyramided on intervening inferences.' " In re Keith C., 378 Ill. App. 3d 252, 260 (2007), quoting People v. Weiss, 263 Ill. App. 3d 725, 731 (1994).

Here, the evidence revealed that defendant grabbed Sandness by the throat. He then pushed her against the couch on which she was sitting. Defendant continued to hold Sandness by the throat against the couch while Sandness and Robles attempted to free Sandness from defendant's grasp. Neither woman was able to free Sandness from defendant. From this evidence, a rational trier of fact

could infer that defendant knew his actions restricted Sandness's movement and was consciously aware that he was unlawfully detaining her.

Citing People v. Kuykendall, 108 Ill. App. 3d 708 (1982), and People v. Haybron, 153 Ill. App. 3d 906 (1987), defendant argues that he was not proved guilty beyond a reasonable doubt of unlawful restraint, because his motivation during the incident was to take his children from Sandness, not to unlawfully restrain her. Although defendant's statements to the police indicated that he had entered Sandness's home that night to retrieve his children, the trial court was not bound to accept defendant's statements of his motivation. See People v. Slinkard, 362 Ill. App. 3d 855, 858 (2005). In any event, we find both Kuykendall and Haybron extremely questionable.

In Kuykendall, the defendant and some coconspirators entered the victim's home. Kuykendall, 108 Ill. App. 3d at 709. While the coconspirators held the victim, the defendant struck the victim. Kuykendall, 108 Ill. App. 3d at 709. The defendant was convicted of unlawful restraint, and he appealed, claiming that he was not proved guilty beyond a reasonable doubt. Kuykendall, 108 Ill. App. 3d at 709-10. The appellate court agreed, noting that the restraint of the victim was only incidental to the battery of the victim and that the intent of the defendant and the coconspirators when they entered the victim's home was to commit a battery, not to unlawfully restrain the victim. Kuykendall, 108 Ill. App. 3d at 710-11. The court then observed that, if the defendant was guilty of unlawful restraint at all, it had to be based on an accountability theory, but the jury was never instructed on accountability. Kuykendall, 108 Ill. App. 3d at 711.

In Haybron, the defendant and a codefendant broke into the victim's home. Haybron, 153 Ill. App. 3d at 907. When the victim turned on a light, one of the men grabbed the victim's arm and ordered her to turn the light off. Haybron, 153 Ill. App. 3d at 907. The defendant was found guilty

of home invasion, armed robbery, unlawful restraint, intimidation, and aggravated battery. Haybron, 153 Ill. App. 3d at 907-08. On appeal, the defendant claimed that he was not proved guilty beyond a reasonable doubt of unlawful restraint. Haybron, 153 Ill. App. 3d at 908. The appellate court agreed, finding that the act of grabbing the victim's arm when she turned on the light "was merely derivative of and circumstantially related to the armed robbery and home invasion." Haybron, 153 Ill. App. 3d at 908.

As defendant notes, this court has already disagreed with Kuykendall and Haybron. See People v. Bergin, 227 Ill. App. 3d 32, 46 (1992). In Bergin, the defendant entered the victim's home, placed a pillow over the victim's head while she was sleeping, and told the victim that he and his coconspirator would kill her children if she talked. Bergin, 227 Ill. App. 3d at 35. A jury found the defendant guilty of unlawful restraint and intimidation, and the defendant appealed, arguing, among other things, that he was not proved guilty beyond a reasonable doubt of unlawful restraint, because his motive when he entered the victim's home was not to restrain her. Bergin, 227 Ill. App. 3d at 34. We affirmed the defendant's conviction of unlawful restraint. Bergin, 227 Ill. App. 3d at 46-47. In so doing, we disagreed with Kuykendall and Haybron to the extent that both of those cases suggested that we should focus on the defendant's motive. Bergin, 227 Ill. App. 3d at 46. Rather than motive, we found that what mattered was whether the defendant acted knowingly when he restrained the victim. Bergin, 227 Ill. App. 3d at 46.

Defendant asks us to reject Bergin and align this case with Kuykendall. That is, defendant argues that "[c]onsidering the context of events, along with the mental state and motivation of the offender, allows appropriate application of the unlawful restraint statute while reducing the inappropriate application of the statute to its peripheral aspects." We refuse defendant's invitation

to reject <u>Bergin</u>. As both <u>Bergin</u> and the unlawful restraint statute make clear, the restraint need only be performed knowingly. The fact that defendant may have had another purpose in entering Sandness's home is simply irrelevant to whether defendant was proved guilty beyond a reasonable doubt of unlawful restraint. See also <u>People v. Paulick</u>, 174 Ill. App. 3d 868, 871 (1988) (in case where the defendant unlawfully restrained the victim and then sexually abused her, this court rejected the defendant's contention that his unlawful restraint conviction must be reversed because his motive was to sexually abuse the victim and not unlawfully restrain her). Thus, we adhere to <u>Bergin</u>.

For these reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

O'MALLEY and HUDSON, JJ., concur.